1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOBBIE ALLEN WOODS, | Case No. 19-cv-01350-JCS |
| Plaintiff, | |
| | **ORDER REGARDING MOTION FOR SUMMARY JUDGMENT, MOTION TO EXCLUDE EXPERT TESTIMONY, AND ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL** |
| v. | |
| CITY OF HAYWARD, et al., | |
| Defendants. | Re: Dkt. Nos. 96, 100, 101, 104 |

## I.    INTRODUCTION

Plaintiff Bobbie Allen Woods brings various claims against Defendants the City of Hayward, the Hayward Police Department, Hayward Police Officer Brandon Tong, and Hayward Police Sergeant Ruben Pola[1] based on a police search of Woods's home pursuant to a warrant. Defendants now move for summary judgment, and Woods moves to exclude certain expert opinion evidence.  The Court held a hearing on September 3, 2021.  For the reasons discussed below, Defendants' motion is GRANTED as to Woods's § 1983 and negligence claims against Tong and Pola, but DENIED as to his Americans with Disabilities Act ("ADA") and negligence claims against the City of Hayward and the Hayward Police Department.  Woods's motion to exclude is GRANTED in large part.  His administrative motions to file under seal are GRANTED in part and DENIED in part, as discussed below.[2]

## II.    BACKGROUND

### A.    Summary of Evidence

This section, intended for context and the convenience of the reader, summarizes relevant

---

[1] Pola is erroneously named in Woods's first amended complaint, which Woods filed pro se, as "Sergeant Polar."

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

United States District Court
Northern District of California

evidence generally in a light favorable to Woods, as is required in resolving Defendants' motion for summary judgment.  It is not intended as a complete recitation of the evidentiary record and should not be construed as resolving any disputed issue of fact.

### 1.  Overview of Search and Woods's Experience

Woods is in his seventies and requires a wheelchair due to Miyoshi myopathy, a form of muscular dystrophy that causes weakness, atrophy, and muscle pain.  Acott Opp'n Decl. Ex. 9 (Label Report) ¶¶ 15, 21.  His condition renders him particularly susceptible to muscle pain and cramping from exposure to cold.  *Id.* ¶¶ 23–26.  Woods also has post-traumatic stress disorder ("PTSD") as a result of his service with the U.S. Air Force during the Vietnam War, which caused flashbacks and other symptoms after his return from the war, although his PTSD had become dormant before the events at issue in this case and did not affect his daily life.  Acott Opp'n Decl. Ex. 8 (Grusd Report) ¶¶ 17, 21–23.  In Vietnam, Woods was responsible for refueling airplanes, and was required to stop refueling when body bags containing dead soldiers were loaded or unloaded from the planes.  *Id.* ¶ 33.

At the time of the events at issue, Woods lived in Hayward with three other people: his caregiver and tenant Nashi Alexander,[3] and Alexander's two minor sons.  *See* Acott Opp'n Decl. Ex. 8 (Grusd Report) ¶¶ 25–26.  Alexander's older son, along with other minors, was suspected of armed robbery and other crimes.  Defendants obtained a search warrant for the house and an arrest warrant for the older son.  Acott Opp'n Decl. Exs. 13, 14.

On March 15, 2018, Woods heard officers outside on a loudspeaker calling for the residents of his house to come outside, and he notified the other residents of his home.  Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 37:1–20.  He also heard a sound like an explosion, which reminded him of his military service:

> I know it was like combat, like I'm back in Vietnam or something; same kind of tactics, you know, we used, you know, with the loudspeakers and things like that, you know, the noise.

*Id.* at 38:19–22.  Woods "tried to scurry out of the bed," but jammed his arms while catching his

---

[3] The record is inconsistent as to whether Woods's caregiver's surname is "Alexander" or "Mixon-Alexander."

United States District Court
Northern District of California

balance. *Id.* at 39:15–17.  He was not able to put on clothes besides the light nightshirt and pants he wore to bed. *Id.* at 39:25–40:10.[4]

A number of Hayward police officers, including officers with rifles and other tactical gear, were positioned outside of Woods's home.  Alexander came out of the house first, and her older son exited next and was placed in handcuffs.  *See* Acott Opp'n Decl. Ex. 21 (body camera footage).  Alexander identified the occupants of the house to the officers, who had incorrectly believed that her older son was her brother, and who did not appear to have been aware of Woods's existence, despite the fact that he owned the home, or that there was a five-year-old child in the home.  Acott Opp'n Decl. Ex. 22 (body camera footage) at 7:30–8:35.[5]  Woods was not included on a list of possible residents of the house in an operations plan that Defendants prepared for the search.  Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 145:12–146:4.  At least by the time that Alexander's son had been placed in handcuffs, the officers were discussing with Alexander and her son that Woods was in the house in a wheelchair, and that Alexander's younger son, who was five years old, was asleep in the house.  *See* Acott Opp'n Decl. Ex. 21 at 10:40–11:10.

When officers ordered Woods to come out of the house with his hands raised, he responded that he had a disability that kept him from raising his arms, and they allowed him to come out of the house with his hands down.  Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 60:11–61:15.  Woods exited the house while officers aimed their firearms at him.  *Id.* at 42:4–11; *see also* Acott Opp'n Decl. Ex. 21 at 12:45–50 (footage of one officer stating "I got lethal" and aiming a rifle).  A timestamp on the body camera recoding indicates Woods left the house around 5:56 AM. Acott Opp'n Decl. Ex. 21 at 13:14–40 (timestamp in "Zulu" time, indicating Greenwich Mean Time).  Woods objected to the manner in which the officers conducted the search, and officers

---

[4] There is some evidence, including video footage and officers' deposition testimony, indicating that Woods had a pink covering over his legs when he left his house.  The parties have not raised that as an issue relevant to the present motions.  Woods apparently told Defendants' psychological expert witness Dr. Greene that he "had a lap towel on."  Acott Decl. Ex. 1 (Greene Report) at 7. At the very least, regardless of whether Woods had some sort of covering over his legs, there is evidence from which a jury could conclude that he was not able to dress sufficiently for the cold before leaving the house.

[5] All citations herein to portions of recordings refer to the time in minutes and seconds from the beginning of the recording, not any other timestamp that might appear on the recording.

United States District Court
Northern District of California

directed him to continue up the street. *See id.* at 13:50–14:25.

Woods told the officers who escorted him up the street that he had a disability, and "that being dressed in the manner that [he] was dressed and [his] condition that [he] needed to return to [his] house or get some kind of blanket or something to cover [himself]," because he noticed that the officers were dressed warmly in gloves and jackets. *Id.* at 61:17–62:16. He made a similar request "several times," trying to space out his requests so as not to "appear to be too persistent," and to give the officers "ample time to respond." *Id.* at 62:17–64:3. Woods did not recall the exact sequence of events or words that he used, but he testified at his deposition that he was "pretty sure" he told the officers he had a disability that made him particularly sensitive to cold. *id.* at 56:10–16.

Woods testified that the officers guarding him "told [him] to stay right here, not to move," although he could not recall with certainty which officer told him that or the exact words the officer used. Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 208:9–209:3, 209:24–210:7. When Woods asked on multiple occasions whether he could return to his home, he was told he could not, but that his "request ha[d] been relayed." *Id.* at 209:9–14. Woods did not ask if he could leave to go anywhere else, because he did not believe there was anywhere else he could go even if granted permission, but he did not feel that he "had the ability to just kind of wheel around while they were doing their work." *Id.* at 210:24–211:14. One of the officers who stood by Woods testified that he told Woods where to park his wheelchair, never told him he was free to leave, "would have asked him . . . to not leave" if Woods had attempted to leave that location, and only left Woods's side when another officer took over standing next to him. Acott Opp'n Decl. Ex. 5 (Uribe Dep.) at 69:10–70:17.

Talking amongst themselves after Woods left the house, police officers appeared to agree that it was too cold outside for the clothing that Woods and the other occupants of the house were wearing:

> [Unidentified officer:] If you guys ever served a search warrant at my house, I'll just tell you what I'm gonna get dressed first. I ain't coming out in my chonies, ain't freezing my own balls off.
>
> [Second unidentified officer:] Hell no. I'd even go to my front door

4

1
2

> and be like, "I'm coming, but I'm gonna get dressed." "Don't go back inside your house." "Fuck you. I'm going back inside. I'm gonna go get dressed. Listen, if I wanted to shoot you I wouldn't have even came to the door."

3    Acott Opp'n Decl. Ex. 21 at 16:45–17:15.

4           At some point after Woods left the house—according to Woods, around half an hour

5    afterwards, although video evidence suggests this occurred around six minutes after he left the

6    house—an officer went across the street to get what Woods described as a "yellow body tarp bag"

7    and offered it to Woods.  Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 52:17–53:9, 65:14–18.  Woods

8    testified that he knew it was a body bag because he "associated with them while in Vietnam,

9    seeing service members being put into them, brought back, only they were black." *Id.* at 53:4–6.

10   According to Woods, he told the officer he "couldn't wear it because it . . . would reset [his]

11   PTSD, seeing body bags and stuff like that, being out in the cold." *Id.* at 53:11–13.  Later in his

12   deposition, Woods described the item as a "tarp" and a "body covering." *Id.* at 153:7–22.  In the

13   background of one officer's body camera recording, another officer can be seen unfolding a

14   yellow sheet-like item—it is not possible from the video to tell whether it is a blanket, tarp, or

15   body bag—while standing by Woods approximately six minutes after Woods left the house.  Acott

16   Opp'n Decl. Ex. 21 at 19:20–49.  Near the end of that recording, the officer appears to be putting

17   the item back in its bag, but the video ends before it is clear whether the officer put the item away

18   or what happened to it.  *See id.*

19          The officers who stood by Woods during the incident did not activate their body cameras.

20   One of those officers, Jesus Uribe, did not remember whether Woods asked for anything to keep

21   him warm, but said that hypothetically if Woods had made such a request: "it's not uncommon for

22   us to carry blankets in your patrol cars.  We carry a yellow packaged blanket.  I would have either

23   asked someone . . . to go grab one or if someone was standing with him, I would try to go grab

24   him one." Acott Opp'n Decl. Ex. 5 (Uribe Dep.) at 57:16–58:5; *see also* Acott Opp'n Decl. Ex. 4

25   (Wright Dep.) at 73:2–74:19 (testifying similarly).

26          A timestamp on another video indicates that Woods was still waiting outside his house

27   with an officer standing by him at around 6:35 AM, around forty minutes after he left the house.

28   Acott Opp'n Decl. Ex. 26 at 0:05.  Woods testified that he held outside for forty to forty-five

United States District Court
Northern District of California

5

minutes before he was allowed to return to his home.  Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 89:11–16.  After he entered the house, he had a conversation with Pola in which Woods stated that the officers' conduct was excessive and Pola disagreed.  *Id.* at 167:16–21.

The cold outside caused painful cramps in Woods's hands, and he continued to experience difficulty with his hands after the incident.  Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 198:3–16.  The experience also aggravated his PTSD symptoms.  *Id.* at 199:7–10.  Throughout the body camera footage in the record, multiple officers can be heard complaining about the cold.  An officer at one point before Woods left the house told someone—presumably Alexander—that they would put her in a car so she could stay warm.  Alcott Opp'n Decl. Ex. 22 at 9:18–21.  Farmer's Almanac data indicates that the temperature in Hayward on March 15, 2018 ranged from a low of 41.0 degrees Fahrenheit to a high of 57.0 degrees.  Acott Opp'n Decl. Ex. 28.[6]

### 2.    Pola's Experience

Pola, a sergeant, was assigned to supervise the search to "ensure that things were taken care of in a legal manner and hopefully using best practices in terms of police procedure." Agarwal Decl. (dkt. 98) Ex. 1 (Pola Dep.) at 35:18–36:7.  He did not recall any other officers on the scene who held an equivalent rank or outranked him.  *Id.* at 35:1–14.  While Woods was outside, a SWAT team cleared the house before Pola and other officers and detectives entered to execute the search warrant.  *Id.* at 44:6–21.

At some point that morning, Pola heard Woods arguing with officers outside, which he considered to be a "disturbance" that "obstructed" the investigation, as compared to "most people at search warrants who usually just obey what the officer is trying to direct them to."  Acott Opp'n Decl. Ex. 3 (Pola Dep.) at 168:21–170:8.  Pola knew that it was cold outside and told another officer that "if he's cold or he needs a blanket, get him a blanket."  *Id.* at 38:15–23. Asked about "any specific instructions or orders" he gave on the day in question, Pola testified:

> I remember seeing him in a wheelchair in the morning and I remember
> a directive where I thought we need to get him back in the house as
> soon as possible and that he needed a blanket. And I remember saying,

---

[6] Woods's unopposed request for judicial notice of this weather information is GRANTED.  *See* dkt. 106.

1    you know, let's get this guy a blanket or get him in here, you know,
     what's the best way we can do that?

2    *Id.* at 37:11–17; *see also id.* at 40:16–41:20.  After giving that instruction to some other officer,

3    Pola "refocused back on what [he] was doing," and did not pay attention to whether Woods

4    actually received a blanket.  *See id.* at 42:10–43:10.

5         Pola testified that he had multiple discussions with Woods, including one in which Woods

6    "talked a little bit about his medical condition" and "what condition he actually had," *id.* at

7    161:16–162:16, but his first conversation with Woods was only after Woods was allowed to

8    reenter the house.  *Id.* at 75:22–24.  Pola did not recall Woods discussing his military service.  *Id.*

9    at 162:17–18.

10   ### 3.    Tong's Experience

11        Tong, a detective, was a member of both the team that initially swept the house to be sure

12   it was secure and no one was hiding inside, and also the team that then searched the house for

13   evidence pursuant to the search warrant.  Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 136:22–137:23.

14   Tong was not in charge of the initial effort to ensure the home was safe, but had some degree of

15   supervisory role with respect to the subsequent search for evidence.  *Id.* at 158:6–24 (noting that

16   Tong was not "the supervisor on scene for the actual service of the warrant; that was Sergeant

17   Pola," but by virtue of Tong's role as a case agent, "if people had questions in regards to the actual

18   search [such as what items to search for], they would probably talk to [him]").

19        After Defendants secured the house, but before they searched it for evidence, Tong left the

20   house and came back in with Alexander to retrieve her younger son.  *Id.* at 225:10–226:2.  He

21   allowed Alexander to put on a pair of sweatpants and to retrieve a blanket.  *Id.* at 226:3–8.  Tong

22   did not recall at his deposition whom the blanket was intended for, but believed it was for

23   Alexander's younger son.  *Id.* at 226:18–227:3.  Asked at his deposition whether it would have

24   been possible to also retrieve a blanket for Woods, Tong testified as follows:

25           I think if I would have known that Mr. Woods wanted a blanket, I
26           probably would have told [Alexander] to grab a blanket for him, as
             well.

27           I think I've told you this before, that I'm not going to just leave
             someone out, you know, in the cold.
28

United States District Court
Northern District of California

1    That's inhumane.

2 *Id.* at 227:12–24.  While inside the house with Tong, more than ten minutes after Woods left the

3 house, Alexander inquired about Woods's welfare, and Tong stated, "I believe they're gonna

4 probably either let you guys go to another location or at some point in time I think they're actually

5 gonna let you guys leave if you guys would like to do that while we search the residence."  Acott

6 Opp'n Decl. Ex. 27 (audio recording) at 27:55–28:12; *see* Acott Opp'n Decl. Ex. 2 (Tong Dep.) at

7 228:1–229:21.

8    Tong spoke to Woods at some point outside the home, but at his deposition he did not

9 remember when that occurred, including whether it was before or after Defendants had secured the

10 premises.  Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 183:8–18.  Uribe testified that Tong came to

11 speak with Woods about "why his house was being searched and that they were going to try to

12 accommodate whatever his needs were" while Uribe was standing with him, but he did not recall

13 whether Tong took over for him or stayed with Woods, or whether Tong was there to take Woods

14 back into the house.  Acott Opp'n Decl. Ex. 5 (Uribe Dep.) at 58:10–59:7.  Tong did not recall

15 Woods asking him for a jacket or blanket or to be allowed to return to the home, or anyone

16 relaying such a request to him.  Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 188:5–189:21.  No

17 conversation between Tong and Woods is included on Tong's audio recording from the day of the

18 search, which runs to around fifteen minutes after Woods left the house.  *See generally* Acott

19 Opp'n Decl. Ex. 27.

20    Tong testified that if another officer had relayed a request for someone to be given a jacket

21 or blanket, he would have either told the officer to fulfill the request or tried to help himself,

22 depending on his other duties at the time, and that he would generally expect other officers to

23 "think on their feet and . . . if someone needs a request, depending on the request, that they do

24 what they can to make it happen."  Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 189:22–191:19.

25    Tong's report from the search indicates that Defendants secured the house "at

26 approximately 0600 hours," and that at "approximately 0630 hours," he "asked Detective Carrasco

27 to search the front/living room for weapons so that Woods [and the other occupants not suspected

28 of a crime] could stay inside the residence while HPD Personnel search the residence because it

8

1  was cold outside and Woods couldn't go anywhere else." Acott Opp'n Decl. Ex. 17. Tong noted

2  in the report that he spoke with Woods, who "was upset that the Special Response Unit secured

3  the residence and the manner in which the residence was secured (occupants called out by officers

4  with rifles)" because Woods "believed that whatever crime HPD was investigating didn't warrant

5  the Special Response Unit." *Id.*

6  **B. Procedural History**

7  Woods's original complaint included the following claims: (1) unreasonable seizure of

8  Woods's person in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) unreasonable

9  search in violation of the Fourth Amendment and 42 U.S.C. § 1983; (3) racial discrimination in

10  violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983;

11  (4) failure to provide a reasonable accommodation in violation of the ADA; (5) negligence;

12  (6) intentional infliction of emotional distress; and (7) invasion of privacy.

13  The Court granted Defendants' motion to dismiss Woods's unreasonable seizure claim

14  because Woods did not allege that, once he was removed from his home, Defendants intentionally

15  acquired "physical control" such that a reasonable person in Woods's position would not feel free

16  to leave. Order Re Mot. to Dismiss (dkt. 35)[7] at 5–6 (citation omitted). The Court dismissed

17  Woods's unreasonable search claim because he relied primarily on a case addressing unreasonable

18  seizures, and because even "[a]ssuming for the sake of argument that an excessive show of force

19  during a search pursuant to a valid warrant might in some circumstances establish a

20  constitutionally unreasonable search without constituting a seizure," Woods failed to allege facts

21  supporting a conclusion that this particular search was unreasonable. *Id.* at 6–7. The Court

22  dismissed Woods's equal protection claim because he failed to allege facts (as opposed to mere

23  conclusory assertions) supporting a conclusion that he was treated differently based on his race.

24  *Id.* at 7–8. The Court allowed Woods's ADA claim to proceed against the City of Hayward and

25  the Hayward Police Department, but dismissed that claim against the individual defendants with

26

27  ---
   [7] *Woods v. City of Hayward*, No. 19-cv-01350-JCS, 2019 WL 5789256 (N.D. Cal. Nov. 6, 2019).
28  Citations herein to the Court's previous orders refer to page numbers of the versions filed in the Court's ECF docket.

prejudice, because "[t]he ADA does not . . . provide a cause of action against individual defendants in their individual capacities." *Id.* at 9–11.  Finally, the Court dismissed Woods's state law claims for failure to allege compliance with California's government claims procedure.  *Id.* at 11–12.

The Court granted Woods leave to amend all of his dismissed claims except for the ADA claims against individual defendants.  In considering whether leave to amend was appropriate, the Court rejected an argument that local police departments cannot be sued under § 1983, noting that the Ninth Circuit has held to the contrary.  *Id.* at 8–9 (citing, *e.g.*, *Shaw v. State of Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 605 (9th Cir. 1986)).

Woods's first amended complaint asserted the following claims: (1) unreasonable seizure of Woods's person in violation of the Fourth Amendment and 42 U.S.C. § 1983, 1st Am. Compl. ("FAC," dkt. 47) ¶¶ 32–37; (2) unreasonable search in violation of the Fourth Amendment and 42 U.S.C. § 1983, FAC ¶¶ 38–44; (3) failure to provide a reasonable accommodation in violation of the ADA, against only the City of Hayward and the Hayward Police Department, *id.* ¶¶ 45–50; (5) negligence, *id.* ¶¶ 51–55; (6) intentional infliction of emotional distress, *id.* ¶¶ 56–61; and (7) invasion of privacy, *id.* ¶¶ 62–68.  Woods no longer brings an ADA claim against the individual defendants, and also omits the equal protection claim that appeared in his original complaint.

On Defendants' second motion to dismiss, the Court dismissed Woods's claims for unreasonable search, invasion of privacy, intentional infliction of emotional distress, and—as to the City of Hayward and the Hayward Police Department only—unreasonable seizure.  Order re Mot. to Dismiss FAC (dkt. 61)[8] at 9–12, 18–20.  Although the Court granted Woods leave to amend some of those claims, he chose not to do so.  *See id.* at 20.  The remaining claims in the case are thus for: (1) unreasonable seizure against Tong and Pola; (2) violation of the ADA against the City of Hayward and the Hayward Police Department; and (3) negligence against all Defendants.  Pro bono counsel was appointed for Woods after the Court resolved the second

---

[8] *Woods v. City of Hayward*, No. 19-cv-01350-JCS, 2020 WL 1233841 (N.D. Cal. Mar. 13, 2020).

United States District Court
Northern District of California

1    motion to dismiss.  Order Appointing Counsel (dkt. 67).

2        **C.    Arguments Regarding Defendants' Motion for Summary Judgment**

3        Defendants argue that Tong and Pola are entitled to summary judgment on Woods's

4    unreasonable seizure claim because neither of them personally placed him in a position where he

5    did not feel free to leave.  Defs.' Mot. (dkts. 96, 97)[9] at 3.  They contend there is no evidence

6    Woods requested to leave the location, other than to go back into the house where the search was

7    being conducted, and regardless, Tong and Pola were not the two officers who Woods asserts were

8    "guarding" him outside the house.  *Id.* at 3–4.  In the alternative, Defendants argue that seizing

9    Woods incident to the search warrant for the home would have been reasonable and permissible

10   under the Fourth Amendment.  *Id.* at 4–5.  Defendants also argue that this case does not resemble

11   *Franklin v. Foxworth*, 31 F.3d 873 (9th Cir. 1994), which involved an unnecessarily painful and

12   degrading detention and raised concerns about detention of elderly and disabled individuals,

13   because Defendants did not unnecessarily prolong Woods's time outside the home, were not aware

14   of his particular susceptibility to cold or his PTSD, and offered him a blanket.  *Id.* at 5–6.

15   Defendants contend that at the very least, Tong and Pola are entitled to qualified immunity.  *Id.* at

16   7.

17       Woods asserts that an officer blocked his path and searched his wheelchair when he left the

18   house, officers directed him where to go and stood by him the whole time he was outside, and his

19   requests to return to the house were refused, all supporting his belief that he was not free to leave.

20   Pl.'s Opp'n (dkt. 102) at 11–12.  He also notes that Tong told Alexander that "at some point" they

21   would be allowed to leave—indicating that at least for some portion of the search, they were not

22   free to do so—and that Tong testified at his deposition that Woods would not have been allowed

23   to simply leave the area immediately after exiting the house.  *Id.*  Woods contends that Tong and

24   Pola, both of whom had decisionmaking authority during the search, can be liable on a theory of

25   failure to intercede even though they were not the specific officers who stood by Woods outside

26

27   ───────────────

28   [9] Defendants filed their memorandum of points and authorities as a separate docket entry from
     their notice of motion.  Citations to this motion refer to page numbers of the memorandum of
     points and authorities.

United States District Court
Northern District of California

United States District Court
Northern District of California

the house. *Id.* at 12–14. He clarifies that he does not dispute Defendants' authority to question him, ask for identification, "or to detain him in some fashion" during the search, but instead argues "that the *conditions* and *nature* of his detention were unreasonable" because he posed no threat, was not suspected of a crime, and was detained outside in the cold in a manner unreasonable in light of his age and disability. *Id.* at 14–15. Woods asserts that *Franklin* is sufficiently clear precedent to deny qualified immunity. *Id.* at 16–19.

With respect to Woods's ADA claim, Defendants argue that "[n]o legal authority provides that [Woods's] request [to be allowed to stay in his home] constitutes a 'reasonable accommodation' and that a denial of such a request is actionable under the ADA," nor that detention during a search is a "program, service or activity" governed by the ADA. Mot. at 8. Defendants contend that even if the ADA applies, there is no evidence of intentional discrimination or deliberate indifference because the officers allowed Woods to leave his home without raising his hands once they learned he was unable to do so, they offered him a blanket (which Woods asserts was a body bag) that he refused, and "there is no evidence in this record that any of the HPD officers on scene recalled being informed of [Woods's] special sensitivity to cold due to his muscular dystrophy or that offering [Woods] the blanket would trigger his PTSD." Defs.' Mot. at 9–10. Defendants also cite deposition testimony from multiple officers that it would not have been safe, and might have compromised the effectiveness of the search, for Woods to remain in the house while the search was conducted. *Id.* at 10.

Woods disputes Defendants' view that the ADA does not apply, arguing instead that the Ninth Circuit has construed that law as "encompass[ing] 'anything a public entity does.'" Pl.'s Opp'n at 19 (quoting *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 135 S. Ct. 1765 (2015)). Woods argues that Defendants knew of his disabilities because he told the officers who were guarding him about both his sensitivity to cold and the fact that the purported body bag they offered him triggered his PTSD, and more generally that they knew he was disabled because he was in a wheelchair and could not raise his arms. *Id.* at 20–21. Woods contends that Defendants denied him an accommodation of allowing him to return to the house or getting him a jacket or blanket—all of which would have

12

1   been reasonable in light of the fact that Defendants allowed Alexander back into the house to get a

2   blanket and warmer clothes for herself—and that Defendants' failure to do so caused Woods

3   cramping and pain.  *Id.* at 21–22.

4       Defendants briefly argue that they are entitled to summary judgment on Woods's

5   negligence claim, with their entire substantive argument as follows:

6         It is clear from the record in this case that did not breach any duty of
      care they had towards Plaintiff. Again, there is no evidence in the
7         record of any HPD officer knowing that Plaintiff had a physical
      disability that would be exacerbated by the cold or that Plaintiff
8         suffered from a mental illness that would be exacerbated by the
      offering of a blanket. Rather, the evidence shows that HPD acted
9         reasonably given the valid search warrant, the high-risk search of the
      residence, the need to ensure that Plaintiff did not return inside until
10        it was secured (for his and officer safety), the offering of the yellow
      blanket within six minutes of Plaintiff exiting the house and then
11        Plaintiff being allowed to return within minutes afterwards.

12  Defs.' Mot. at 11.

13      Woods addresses the negligence claim in more detail, arguing that despite Defendants

14  having ordered Woods outside and their purported recognition "that Woods should not be waiting

15  outside in the cold during the search," they failed to avoid or remedy that situation by "pre-staging

16  a vehicle equipped for wheelchair users, offering Woods a blanket or jacket from his house, or

17  moving him inside."  Pl.'s Opp'n at 24.  Woods contends that Defendants' had a generally-

18  applicable duty of care under California Civil Code section 1714 and that their breach of that duty

19  proximately caused Woods harm, including muscular pain and PTSD symptoms.  *Id.* at 23–25.

20  **III.   ANALYSIS OF MOTION FOR SUMMARY JUDGMENT**

21      **A.   Legal Standard**

22      Summary judgment on a claim or defense is appropriate "if the movant shows that there is

23  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

24  law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

25  the absence of a genuine issue of material fact with respect to an essential element of the non-

26  moving party's claim, or to a defense on which the non-moving party will bear the burden of

27  persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

28      Once the movant has made this showing, the burden then shifts to the party opposing

13

summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## B.   Fourth Amendment Claim

Woods's first remaining claim is against Tong and Pola under 28 U.S.C. § 1983, for violation of the Fourth Amendment's prohibition of unreasonable seizures.  A seizure "in the constitutional sense . . . occurs when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave." *Doe ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003).  "Violation of the Fourth Amendment requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).  The Fourth Amendment right to be free of unreasonable seizures requires as a "general rule" that "seizures are 'reasonable'

14

only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 193 (2013) (citation and internal quotation marks omitted).

"An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (citing *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)). "Integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation . . . [b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation." Id. (citations and quotation marks omitted). Thus, "[o]fficers are fundamentally involved in the alleged violation when they provide affirmative physical support at the scene of the alleged violation and when they are aware of the plan to commit the alleged violation or have reason to know of such a plan, but do not object." *Monteilh v. County of Los Angeles*, 820 F. Supp. 2d 1081, 1089–90 (C.D. Cal. 2011). "Additionally, officers may be integral participants even if they have no knowledge of a plan to commit the alleged violation if their physical participation in the alleged violation was part of a closely related series of physical acts leading to the violation." *Id.* (citing *Blankenhorn*, 485 F.3d at 481 n.12). "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citation and internal quotation marks omitted). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.*

A jury could find that a reasonable person in Woods's position while he waited outside would not have felt free to leave, and that Woods was therefore subject to a seizure. The record indicates that officers directed Woods where to go, stood by him for the duration of the search, and refused his requests to go back into the house. There is no evidence that, after officers directed him where to wait, anyone indicated to him that he was free to leave. There is also some evidence that Woods was in fact not free to leave, in that Tong told Woods's caregiver more than ten minutes after Woods left the house that they would only be free to go at some point in the future. Acott Opp'n Decl. Ex. 27 at 27:55–28:12. Defendants are not entitled to summary judgment on the question of whether Woods was seized.

The Supreme Court has held that Fourth Amendment allows "officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted,'" without need for "particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Bailey v. United States*, 568 U.S. 186, 193 (2013) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 (1981)).

The Supreme Court recognized in *Summers* that "special circumstances, or possibly a prolonged detention, might" render detention during a valid search pursuant to a warrant unconstitutional "in an unusual case," 452 U.S. at 705 n.21, and the Ninth Circuit has applied that exception to reverse the results of a bench trial and hold unconstitutional officers' conduct in "removing a gravely ill and semi-naked man from his sickbed without providing any clothing or covering, and then . . . forcing him to remain sitting handcuffed in his living room for two hours rather than returning him to his bed within a reasonable time after the search of his room was completed," *Franklin v. Foxworth*, 31 F.3d 873, 876–77 (9th Cir. 1994). In that case, the officers "cuffed [the plaintiff's] hands behind his back, carried him into the living room, and placed him on a couch, with his genitals exposed," and "[n]o effort was made to obtain clothing or any covering for him." *Id.* at 875. The Ninth Circuit explained its reasoning, in part, as follows:

> A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns. Of course, the presence of any of these factors in an individual case does not establish that the detention is unreasonable *per se*. Rather, these factors, along with the *Graham* elements and any other circumstances relevant to an individual case, must be assessed in their totality.
>
> [. . .]
>
> None of the officers had any reason to believe, on the basis of the information they had prior to the search or their observations once in the house, that Curry had committed a crime, or that he was armed. In fact, the officers were not even aware that Curry lived in the house prior to executing the warrant. It should also have been clear to them that Curry was not a gang member. Finally, it should have been obvious to the officers that Curry presented little risk of danger to them, that he presented absolutely no risk of flight, and that it was highly unlikely that he could interfere with their search in any way.

[. . .]

> We emphasize that it is not the fact that there was a more reasonable alternative available that leads us to our conclusion. It is the fact that the officers conducted the detention of Curry in a wholly unreasonable manner—a manner that wantonly and callously subjected an obviously ill and incapacitated person to entirely unnecessary and unjustifiable degradation and suffering. Even had Curry been thought to have been guilty of criminal behavior, we would be required to reject such conduct on the part of individuals sworn to uphold the law. Given the circumstances of this case, the violation was egregious and the injuries substantial.

*Id.* at 876–78.  In a later case where an elderly plaintiff suspected of possessing stolen lunar rocks was detained in a restaurant parking lot for multiple hours of interrogation in urine-soaked pants, the Ninth Circuit held that the plaintiff raised genuine issues of material fact both as to the reasonableness of the manner of detention and as to qualified immunity, noting that while the circumstances were arguably less severe than in *Franklin*, that precedent "does not require that a detention be so egregious to be found unreasonable." *Davis v. United States*, 854 F.3d 594, 600 (9th Cir. 2017).

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (cleaned up).  The qualified immunity inquiry does not alter the general rule on summary judgment that factual disputes and reasonable inferences must be resolved in favor of the non-moving party.  *See id.* at 657–60.

This case overlaps in some ways with *Franklin*.  Woods was obviously disabled in that he was in a wheelchair, and he obviously did not meet the description of the juvenile suspects accused of committing the crimes under investigation.  There is no indication that, once Woods left the house and the officers searched his wheelchair, any officer believed him to be a threat.  A jury could also conclude that Woods was held outside with inadequate clothing during the search.

That said, there is no evidence that either Tong or Pola—the only remaining defendants named in Woods's Fourth Amendment claim—knew of Woods's specific disability with respect

to cold, or of his PTSD and its association with the yellow covering that he was offered and refused.  The only officers Woods specifically recalled telling about the effects of his disability were the officers who escorted and stood by him while he was outside, who by all accounts were not Tong or Pola.  The Court need not decide whether an officer who knew of Woods's specific sensitivity to cold, and of his PTSD-triggering reaction to the covering he was offered, could be held liable for an unreasonable seizure under *Franklin*, because the individual defendants here had no such knowledge.

As the officer in charge of executing the warrant, Pola likely had an opportunity to intercede to ensure Woods was kept warm.  Pola testified that he took at least one step to do so: he instructed another officer to get Woods a blanket.  Acott Opp'n Decl. Ex. 3 (Pola Dep.) at 37:11–17.  Offering Woods a blanket likely would have been sufficient to avoid any constitutional unreasonableness in detaining him outside in the forty-something-degree cold, particularly given that it was one of the accommodations Woods specifically requested, Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 153:11–13.  Woods was in fact offered some kind of covering, which he perceived as a body bag.  *Id.* at 52:17–53:9.  While Woods testified that the offer was made around thirty minutes after he left the house, *id.* at 52:17–20, a jury could not reasonably credit his testimony as to that timing when video evidence shows an officer unfolding a yellow item, generally meeting Woods's description of the covering he was offered, next to Woods around six minutes after he left the house.  *See* Acott Opp'n Decl. Ex. 21.[10]

Turning to Tong, he testified that he saw Woods coming out of the home in his wheelchair. Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 181:15–182:2.  Tong was at the time preparing to take part in the SWAT (or "SRU") team's effort to secure the house.  There is no evidence that he was responsible for managing the treatment of people outside the house, or that he had reason to believe that Woods would be held outside for an extended period without being offered some way

---

[10] Woods's testimony that he waited around half an hour before he was offered the yellow covering, and that after refusing that covering he was outside for a further "at least half an hour," is also inconsistent with his testimony that he was detained on the sidewalk for a total of around forty to forty-five minute.  *See* Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 52:17–20, 89:11–16, 154:5–12

United States District Court
Northern District of California

to stay warm.  Tong also spoke to Woods outside at some point later, *see, e.g.*, *id.* at 183:8–15, although there is little evidence of when that conversation occurred other than the fact that it is not included on Tong's personal audio recording, which ended around fifteen minutes after Woods left the house.  There is no evidence that Woods told Tong that he was cold or requested any accommodation from him, or that Tong knew of Woods's relevant disabilities besides the fact that he was in a wheelchair.

In sum, both individual defendants knew that Woods had been ordered out of the house.  They had opportunities to observe him, and therefore reason to know that he was an older man in a wheelchair and only lightly dressed.  But even viewing the record in the light most favorable to Woods, there is no evidence that these defendants knew of his susceptibility to cold, his PTSD, that he had requested a blanket and to wait inside, or that he refused the covering another officer offered him because it triggered his PTSD.  Pola instructed another officer to give Woods a blanket, while Tong believed that if someone in Woods's position had requested a blanket, the officer to whom that request was directed would have tried to fulfill it.  Even taking into account Woods's age and mobility impairment, it is difficult to see how a jury could conclude that either of these defendants was aware that Woods had been subjected to a "wholly unreasonable" detention amounting to a Fourth Amendment violation as described in *Franklin*, 31 F.3d at 876–78, such that they were required to intercede.  At the very least, Woods has identified no authority sufficient to show that Tong and Pola's failure to take further steps to intercede "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.  While a plaintiff need not identify precedent with an *identical* fact pattern to defeat qualified immunity, no case that Woods has cited indicates that, under the circumstances known to Tong and Pola, keeping Woods outside under the supervision of another officer while the house was secured and for part of the time it was being searched was "wholly unreasonable."

This case is somewhat troubling because Woods's testimony indicates that other officers *were* aware of Woods's particular disabilities, including the PTSD that caused him to reject the yellowing covering offered to him, and yet no apparent effort was made to find him a more

United States District Court
Northern District of California

1   suitable blanket or clothing—even though Alexander was permitted to gather clothes and blankets

2   from the house under Tong's supervision before the search was completed and well before Woods

3   was allowed back into the house.  It is not obvious that an officer who knew of Woods's particular

4   susceptibility to cold, and his reason for refusing the covering initially offered to him, would be

5   entitled to summary judgment on this record.  In the absence of any indication that Tong or Pola

6   had such knowledge, however, Defendants' motion for summary judgment on Woods's § 1983

7   claim against those officers is GRANTED.

8       **C.   ADA Claim**

9       Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason

10  of such disability, be excluded from participation in or be denied the benefits of such services,

11  programs or activities of a public entity, or be subjected to discrimination by any such entity."  42

12  U.S.C. § 12132.  That provision can encompass "anything a public entity does."  *Lee v. City of Los*

13  *Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (citation and internal quotation marks omitted).  A

14  plaintiff's participation in the state activity at issue need not have been "voluntary" to bring it

15  within the ambit of the ADA.  *See Penn. Dep't of Corr. v. Yaskey*, 524 U.S. 206, 211 (1998).

16      In order to state a claim under Title II of the ADA, a plaintiff must allege:

17          (1) he is an individual with a disability; (2) he is otherwise qualified
            to participate in or receive the benefit of some public entity's services,
18          programs, or activities; (3) he was either excluded from participation
            in or denied the benefits of the public entity's services, programs, or
19          activities, or was otherwise discriminated against by the public entity;
            and (4) such exclusion, denial of benefits, or discrimination was by
20          reason of [his] disability.

21  *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (citation and internal

22  quotation marks omitted; alteration in original).  Title II may be violated in at least two distinct

23  ways: (1) by singling out a disabled person for adverse treatment *because of* that person's

24  disability; or (2) by failing to provide a reasonable accommodation to a person with a disability.

25  *See, e.g.*, *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009).  Under the

26  latter theory, "a public entity [must] 'make reasonable modifications in policies, practices, or

27  procedures when the modifications are necessary to avoid discrimination on the basis of disability,

28  unless the public entity can demonstrate that making the modifications would fundamentally alter

United States District Court
Northern District of California

1  the nature of the services, program, or activity.'" *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d

2  1041, 1046 (9th Cir. 1999) (quoting 28 C.F.R. § 35.130(b)(7)).  Monetary damages under the

3  ADA require a showing of "intentional discrimination," which can be satisfied by showing

4  deliberate indifference.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

5        The Ninth Circuit has held that a plaintiff may bring a claim under Title II of the ADA

6  "where, although police properly investigate and arrest a person with a disability for a crime

7  unrelated to that disability, they fail to reasonably accommodate the person's disability in the

8  course of investigation or arrest, causing the person to suffer greater injury or indignity in that

9  process than other arrestees." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th

10 Cir. 2014), *rev'd in part on other grounds*, 135 S. Ct. 1765 (2015).[11]  Accordingly, even a facially

11 neutral policy can "discriminate[] on the basis of disability," *see Weinreich*, 114 F.3d at 978, if it

12 subjects a person with a disability to "greater injury or indignity" than someone who is not

13 disabled, *Sheehan*, 743 F.3d at 1232.

14       Defendants argue in both their motion and reply that no authority exists for applying Title

15 II of the ADA to the execution of a search warrant, and particularly to a plaintiff having to wait

16 outside while the search is conducted, noting that nothing in *Sheehan* "state[s] that the ADA

17 applies to all police investigations, even if there are no arrests." Defs.' Reply (dkt. 110) at 7–8

18 (emphasis omitted); *see* Defs.' Mot. at 9.  This argument, at least as presented, is frivolous.

19 Longstanding Ninth Circuit precedent, quoted in *Sheehan* but dating back more than twenty years,

20 recognizes that Title II applies to "anything a public entity does." *Sheehan*, 743 F.3d at 1232

21 (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee*, 250

22 F.3d at 691)).  Defendants have offered no explanation for why police treatment of occupants of a

23 home subject to search is or should be an exception that broad rule, particularly when the Ninth

24

25

---

26 [11] In *Sheehan*, the City and County of San Francisco initially sought certiorari on the question of
   whether the ADA applies to the conduct of police officers confronted with violence, but after
27 certiorari was granted, presented no such argument in its briefs to the Supreme Court.  *Sheehan*,
   135 S. Ct. at 1772–73.  The Supreme Court dismissed certiorari as improvidently granted as to the
28 ADA claim, but reversed the Ninth Circuit on unrelated issues pertaining to the plaintiff's separate
   claim under 42 U.S.C. § 1983.  *Id.* at 1774, 1778.

United States District Court
Northern District of California

Circuit has already held that it applies to arrests.[12]

The question then, is whether the City of Hayward and the Hayward Police Department "fail[ed] to reasonably accommodate [Woods's] disability in the course of investigation . . . , causing [him] to suffer greater injury or indignity in that process" that other similarly situated residents of a house subject to search. *See Sheehan*, 743 F.3d at 1232. Defendants argue that they offered Woods reasonable accommodations in allowing him to exit the house without raising his hands, and in offering a yellow (purported) blanket around six minutes after Woods left the house. Defs.' Mot. at 10. They also argue that Woods cannot show deliberate indifference when no officer recalls Woods having communicated his particular sensitivity to cold or that the yellow covering exacerbated his PTSD. *Id.* These arguments disregard Woods's testimony that he told the officer who offered him the covering that he would not use it because it triggered his PTSD, and that he told the officers guarding him about his susceptibility to cold. Acott Opp'n Decl. Ex. 1 (Woods Dep.) at 53:11–13, 56:10–16. On Defendants' motion for summary judgment, the Court must resolving this conflicting evidence—assuming for the sake of argument that the officers' failure to recall such statements from Woods even creates a conflict—in Woods's favor.

A jury could find that offering the yellow covering was not a reasonable accommodation once the officer who did so was told it triggered Woods's PTSD due to its resemblance to a body bag. A jury could also find that other reasonable accommodations were available, including allowing Woods to remain in the home under supervision, allowing him to briefly reenter under supervision to retrieve blankets or warm clothes, or retrieving blankets or warm clothes from his home for him. While Defendants dispute whether some of those accommodations would have been reasonable, Woods offers a report by police conduct and disability expert Dr. John Peters

---

[12] Defendants' argument that they are entitled to judgment based on Woods's failure to cite a case directly on point resembles in some ways an appeal to qualified immunity, although Defendants have not argued explicitly that that doctrine applies here. Woods no longer asserts an ADA claim against any individual defendant. Where, as here, "no individual-capacity suits exist under the ADA, qualified immunity is not available." *Trujillo v. Rio Arriba Cty.*, No. CIV 15-0901 JB/WPL, 2016 WL 4035340, at *12 (D.N.M. June 15, 2016) (citing *Mason v. Stallings*, 82 F.3d 1007, 1009–10 (11th Cir. 1996)). Regardless, even if that doctrine were at issue, clear precedent holding that Title II encompasses "anything a public entity does" would be sufficient to put a reasonable defendant on notice that it applies to police searches.

1    endorsing those options as appropriate, which Defendants have not moved to exclude.  Acott

2    Opp'n Decl. Ex. 7 (Peters Report) at 7–11.  Again, resolving conflicts in Woods's favor, a jury

3    could credit Peters's conclusions, particularly when Defendants allowed Alexander to retrieve

4    items from the house under Tong's supervision well before Woods was allowed to return.[13]

5         A jury could find that Hayward Police Department officers were aware of Woods's

6    particular relevant disabilities, that they were deliberately indifferent to those disabilities in

7    refusing his requests for reasonable accommodation, and that Woods suffered physical injury and

8    indignity beyond what similarly situated non-disabled individuals experienced as a result.

9    Defendants' motion for summary judgment on Woods's ADA claim is DENIED.

10        **D.    Negligence Claim**

11        "A plaintiff in any negligence suit must demonstrate 'a legal duty to use due care, a breach

12   of such legal duty, and [that] the breach [is] the proximate or legal cause of the resulting injury.'"

13   *Kesner v. Superior Court*, 1 Cal. 5th 1132, 1142 (2016) (quoting *Beacon Residential Community*

14   *Assn. v. Skidmore, Owings & Merrill LLP*,  59 Cal. 4th 568, 573 (2014)).  "Everyone is

15   responsible, not only for the result of his or her willful acts, but also for an injury occasioned to

16   another by his or her want of ordinary care or skill in the management of his or her property or

17   person."  Cal. Civ. Code § 1714; *see also Kesner*, 1 Cal. 5th at 1142 ("California law establishes

18   the general duty of each person to exercise, in his or her activities, reasonable care for the safety of

19   others." (citation omitted)).  "[I]n the absence of a statutory provision establishing an exception to

20   the general rule of Civil Code section 1714, courts should create one only where clearly supported

21   by public policy."  *Kesner*, 1 Cal. 5th at 1143 (citations and internal quotation marks omitted).

22        Defendants' argument as to Woods's negligence claim consist almost entirely of

23   conclusory assertions that they acted reasonably and incorporation of their arguments on the

24   claims discussed above.  Defs.' Mot. at 11; Defs.' Reply at 9–10.  For essentially the same reasons

25   discussed above in the context of the ADA claim, a jury could find that employees of the City of

26

27   _____

     [13] Tong's testimony and audio recording suggest that he brought Alexander into the house
28   primarily so she could wake and remove her younger son, rather than specifically for the purpose
     of retrieving clothes and blankets.  Her entry to the house is therefore not a perfect comparison to
     allowing Woods to enter, but it remains relevant.

United States District Court
Northern District of California

Hayward and the Hayward Police Department negligently failed to respond appropriately once notified of Woods's disability, and that those defendants are vicariously liable for their employees' negligence. *See* Cal. Gov't Code § 815.2(a) (establishing respondeat superior liability for public entities). Woods's expert Dr. Peters also concluded that the officers responded for planning the operation acted unreasonably, and below the standard of "general police practices," in failing to identify the occupants of the home to be searched and make arrangements to deal with Woods's disability in the eight days between issuance and execution of the search warrant. Acott Opp'n Decl. Ex. 7 (Peters Report) at 11–13. That expert opinion—which again, Defendants have not moved to exclude—is unrebutted, and could support a finding that employees of the City of Hayward and Hayward Police Department were negligent in failing to conduct due diligence and, upon learning at least of Woods's mobility impairment, bring a wheelchair capable van or some other accommodation to allow Woods to stay warm during the pre-dawn search.

That analysis does not encompass Pola and Tong, however. As discussed above in the context of the § 1983 claim, Woods has identified no evidence that Pola or Tong was aware of his susceptibility to cold or his PTSD during the time he was detained outside, or that they knew his request for a blanket that did not trigger his PTSD was refused. Woods has also identified no evidence that Pola or Tong was involved with investigating or planning the operation ahead of time.[14] Nothing in the portion of Woods's brief addressing his negligence claim, or in Dr. Peters's report, addresses Pola or Tong's culpability specifically. *See* Pl.'s Opp'n at 22–25; *see generally* Acott Opp'n Decl. Ex. 7 (Peters Report).

Defendants' motion for summary judgment is GRANTED as to Woods's negligence claim

---

[14] At Pola's deposition, he testified as follows:
> Q. Do you recall who was involved in the -- the people that were involved in the planning of the operation?
> A. In the planning, no. I don't know who was involved other than the case agent. And I just don't know what his involvement was other than I've read his name that was on the operational plan as the author.
> Q. Was that Detective McMahon?
> A. Yes.

Acott Opp'n Decl. Ex. 3 (Pola Dep.) at 5:15–24. Tong testified that he was "not familiar with the personnel involved in regards to the planning, what type of intelligence gathering they did." Acott Opp'n Decl. Ex. 2 (Tong Dep.) at 144:12–15.

24

1  against Tong and Pola, but DENIED as to his negligence claim against the Hayward Police

2  Department and the City of Hayward.

3  **IV.    MOTION TO EXCLUDE EXPERT OPINION**

4      **A.    Background**

5          **1.    Dr. Greene's Report**

6      Dr. John Greene, M.D., a psychiatrist, was retained by Defendants to conduct an

7  independent medical evaluation of Woods addressing mental illness.  Acott Decl. (dkt. 101-1) Ex.

8  1 (Greene Report) at 1.  He has extensive practice experience and has testified as an expert in

9  many cases.  *See* Agarwal Opp'n Decl. (dkt. 103) Exs. A, B.  He relied on his own examination of

10  Woods; testing that he submitted to another doctor, James Bramson, Psy.D., for scoring and

11  interpretation; Woods's historical medical records; deposition transcripts; and certain documentary

12  and audiovisual evidence regarding the events at issue.  Acott Decl. Ex. 1 (Greene Report) at 1–2.

13  Dr. Greene diagnosed Woods with PTSD.  *Id.* at 32–33.

14      Dr. Greene offers two opinions.  First, he opines "that on 3/15/18, the Hayward Police

15  Department could not have been aware that their actions could potentially exacerbate Mr. Woods'

16  PTSD symptoms," based on Dr. Greene's views that: (1) Woods's report of PTSD symptoms "was

17  predominantly caused by his misperception of what he was given for warmth"; (2) "Woods did not

18  report that he was suffering from PTSD symptoms after he was provided the blanket, during the

19  3/15/18 incident"; and (3) "Woods did not express symptoms of PTSD observable by others on

20  3/15/18."  *Id.* at 33–38.

21      Dr. Greene's second opinion is that "Woods did not suffer from severe emotional distress

22  as a result of the 3/15/18 incident."  *Id.* at 38.  He reports that Woods "indicated he experienced

23  some symptoms of PTSD after the 3/15/18 incident, [but] did not present with substantial

24  symptoms of PTSD after the incident occurred."  *Id.*  Dr. Greene states that Woods "did not

25  present that he subsequently experienced all of the" defined symptoms of PTSD, and while he

26  "presented that some of his function ability was impaired as a result of the symptoms he

27  experienced, he presented that his overall functioning has not been impaired due to PTSD."  *Id.* at

28  39.  Dr. Greene also states that Woods has not received or been recommended for intensive

United States District Court
Northern District of California

United States District Court
Northern District of California

1  treatment, and that he has avoided group counseling and psychiatric medication. *Id.* at 39–40. Dr.

2  Greene asserts that the test results analyzed by Dr. Bramson "indicate[] that his current

3  psychological presentation is not predominantly related to PTSD." *Id.* at 40.

4      The parties do not rely on Dr. Greene's opinions in their briefing on Defendants' motion

5  for summary judgment. For the purpose of this order, Dr. Greene's opinions are relevant only to

6  Woods's motion to exclude them at trial.

7                    **2.    Arguments Regarding Motion to Exclude**

8      Woods moves to exclude Dr. Greene's opinions under *Daubert v. Merrell Dow*

9  *Pharmaceuticals*, 509 U.S. 579 (1993). Pl.'s Mot. (dkt. 101). He contends that Dr. Greene's

10 opinion on whether Defendants would have been aware of Woods's PTSD is not based on

11 specialized knowledge and usurps the jury's role as finder of fact. *Id.* at 2–4. He argues that Dr.

12 Greene's opinion on a lack of "severe emotional distress" is "neither relevant nor helpful,"

13 because Dr. Greene identified that term at his deposition as referring to legal rather than medical

14 standard, and the legal standard would be relevant only to Woods's now-dismissed claim for

15 intentional infliction of emotional distress. *Id.* at 4–5. Woods also argue that to the extent Dr.

16 Greene's opinions are based on Dr. Bramson's analysis of psychological tests, Dr. Greene may not

17 testify to another experts conclusions that he does not himself understand, *id.* at 6–7; to the extent

18 they are based on Woods's purportedly limited treatment, he has not identified any basis to infer

19 severity of mental illness from treatment utilization, *id.* at 7–8; and to the extent they are based on

20 Woods's failure to present "substantial symptoms," that is not supported by the record and Dr.

21 Greene has not identified any valid reason to infer severity based on the number of symptoms

22 presented, *id.* at 8–9.

23     Defendants argue that  Dr. Greene's opinion on the Hayward Police Department's lack of

24 awareness of Woods's PTSD "is based on his expertise in evaluating the signs and symptoms that

25 someone with PTSD should have had in [Woods's] position during the subject incident on March

26 15, 2018," and should be allowed based on Dr. Greene's qualification as a board-certified clinical

27 and forensic psychiatrist. Defs.' Opp'n (dkt. 102) at 1–2. Defendants contend that Woods cannot

28 rely on Greene's deposition testimony to discredit his opinions, because the deposition—which

United States District Court
Northern District of California

defense counsel insisted on ending, with a possibility of resuming later—was never completed. *See id.* at 2.  As for Dr. Greene's opinion on a lack of "severe emotional distress," Defendants argue that emotional distress remains relevant to Woods's damages even though his intentional infliction claim has been dismissed, and that it requires expert analysis.  *Id.* at 2–3.  They assert that Woods has misinterpreted the test results on which Dr. Greene relies, and that "there is no legal authority that disallows Dr. Greene from relying on the psychological testing by Dr. Bramson as one basis to form his opinion on emotional distress."  *Id.* at 4.  To the extent Woods characterizes Dr. Greene's opinions as "conjecture," Defendants argue that is a matter for cross-examination at trial, not exclusion.  *Id.* at 5–6.

**B.    Analysis**

**1.    Legal Standard**

Rule 702 of the Federal Rules of Evidence permits a party to offer testimony by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  This rule embodies a "relaxation of the usual requirement of firsthand knowledge," *Daubert*, 509 U.S. at 592, and requires that certain criteria be met before expert testimony is admissible.  The rule sets forth four elements, allowing such testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  These criteria can be distilled to two overarching considerations: "reliability and relevance."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  The inquiry does not, however, "require a court to admit or exclude evidence based on its persuasiveness."  *Id.*

The reliability prong requires the court to "act as a 'gatekeeper' to exclude junk science," and grants the court "broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability."  *Id.* (citing *Kumho Tire*

1   *Co. v. Carmichael*, 526 U.S. 137, 145, 147–49, 152 (1999)).  Evidence should be excluded as

2   unreliable if it "suffer[s] from serious methodological flaws."  *Obrey v. Johnson*, 400 F.3d 691,

3   696 (9th Cir. 2005).

4       The relevance prong looks to whether the evidence "fits" the issues to be decided:

5   "scientific validity for one purpose is not necessarily scientific validity for other, unrelated

6   purposes," and "[e]xpert testimony which does not relate to any issue in the case is not relevant."

7   *Daubert*, 509 U.S. at 591.  "Where an 'expert report' amounts to written advocacy . . . akin to a

8   supplemental brief, a motion to strike is appropriate because this evidence is not useful . . . ."

9   *Williams v. Lockheed Martin Corp.*, No. 09CV1669 WQH, 2011 WL 2200631, at *15 (S.D. Cal.

10  June 2, 2011) (citation omitted; first ellipsis in original).  Moreover, "an expert witness cannot

11  give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law[;] . . .

12  instructing the jury as to the applicable law is the distinct and exclusive province of the court."

13  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (citations and

14  internal quotation marks omitted).  An expert nevertheless may, in appropriate circumstances, rely

15  on the expert's understanding of the law and refer to the law in expressing an opinion regarding

16  professional norms.  *Id.* at 1016–17.

17       **2.    Dr. Greene's Opinion on Defendants' Knowledge Is Inadmissible**

18       Dr. Greene's opinion that "the Hayward Police Department could not have been aware that

19  their actions could potentially exacerbate Mr. Woods' PTSD symptoms" plainly usurps the role of

20  the jury.  "Courts routinely exclude as impermissible expert testimony as to intent, motive, or state

21  of mind," which often "offers no more than the drawing of an inference from the facts of the

22  case."  *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D.

23  Or. 2013).  Defendants cite no authority allowing this sort of testimony under comparable

24  circumstances.

25       The overarching conclusion Dr. Greene presents as to Defendants' lack of awareness is

26  based largely on his non-specialized interpretation of factual questions based on deposition

27  testimony—most notably, whether the covering offered to Woods was a blanket as opposed to a

28  tarp that could be used as a body bag, and whether Woods told the officer who offered him that

United States District Court
Northern District of California

United States District Court
Northern District of California

1   covering that it triggered his PTSD.  While Woods is correct that in doing so, Dr. Greene simply

2   ignores Woods's testimony that contradicts his conclusions, the bigger issue is not whether he

3   evaluated this evidence correctly, but instead that it is not a matter that calls for or falls within his

4   expertise.  Defendants also have not explained why Dr. Greene's expertise as a clinical and

5   forensic psychiatrist qualifies him to offer opinions as to what conclusions non-psychiatric-expert

6   police officers would draw from Woods's statements or behavior.  What actually occurred during

7   the search, and what inferences Defendants drew or should have drawn, are questions for the jury

8   that do not require Dr. Greene's specialized knowledge.  Woods's motion is GRANTED as to

9   these opinions.

10              **3.      Dr. Greene's Opinion on "Severe Emotional Distress" Is Inadmissible**

11         Dr. Greene's report does not clearly explain what the term "severe emotional distress"

12   means or why he has framed his opinion in that manner.  At his deposition, Dr. Greene made clear

13   that he understood this to be a legal term.  Acott Decl. Ex. 2 (Greene Dep.) at 71:21–25 ("So in

14   my experience, severe emotional distress is understood by the court of individuals who suffer from

15   substantial symptoms of mental illness, a presence of symptoms of mental illness . . . ."); *id.* at

16   72:5–7 ("Q. Severe emotional distress is a legal concept; is that right? A. That's correct."); *id.* at

17   73:14–16 ("[S]o there is no medical definition; is that correct? A. That's correct.").  He generally

18   defined the term as meaning "somebody who suffers from symptoms and generally symptoms of a

19   mental illness, and that as a result of those symptoms of mental illness, they have impairment in

20   functioning." *Id.* at 76:1–5.

21         Woods is correct that Dr. Greene's opinion as to "severe emotional distress," even if it

22   might ever be admissible, is misplaced in this case.  It is not clear from what source he draws his

23   formalistic definition based on symptoms and impairments.  Under California law, for the purpose

24   of an intentional infliction claim—which is no longer at issue in this case—"[s]evere emotional

25   distress means emotional distress of such substantial quality or enduring quality that no reasonable

26   person in civilized society should be expected to endure it." *Hughes v. Pair*, 46 Cal. 4th 1035,

27   1051 (2009) (cleaned up).  For the purpose of emotional distress damages, which *are* at issue in

28   this case, "[t]here is no fixed standard" for assessing these "subjective" injuries, and "the

United States District Court
Northern District of California

1  determination is committed to the discretion of the trier of fact."  *Phipps v. Copeland Corp. LLC*,

2  64 Cal. App. 5th 319, 703–04 (2021) (cleaned up).

3      In offering what he believes to be a legal standard, Dr. Greene usurps the role of the Court

4  in instructing the jury on the law, and would instruct the jury incorrectly for the purpose of this

5  case.  The question of what symptoms or impairments Woods experienced from his PTSD is not

6  relevant to the only issue of emotional distress remaining in this case: the "subjective" inquiry of

7  the degree to which he was distressed and the damages, if any, appropriate to compensate him for

8  such distress—a question left entirely to the finder of fact.  *See id.*  Woods's motion is GRANTED

9  as to Dr. Greene's opinions on "severe emotional distress."

10      **4.      Dr. Greene May Not Testify as to Woods's Test Results**

11      Dr. Greene relies on a number of tests he administered but did not score, and instead sent

12  to Dr. Bramson for evaluation.  Dr. Bramson has not been designated as a testifying expert

13  witness.  Dr. Greene also made clear that he relied largely, if not entirely, on Dr. Bramson's

14  expertise in evaluating Woods's test results.

15      Q. If we had a question about the scoring or interpretation of the
    psychological testing that was used on Mr. Woods in this case, is Dr.
16      Bramson the person we would have to talk to?

17      A. If you wanted to talk about the specific interpretation of the T
    scores or the actual values, yes, you would.
18

19      [. . .]

20      Q. Did you consider the results from the testing to be accurate?

21      A. I'm not sure what you mean by "accurate."

22      Q. Well, I'll just rephrase it. Once you received this report from Dr.
    Bramson, did you do anything to audit the results to confirm that they
    accurately reflected the testing that was performed on Mr. Woods?
23

24      A. No.

25      Q. You didn't rescore the test answers submitted by Mr. Woods; is
    that correct?

26      A. I did not.

27      Q. Did you even review Mr. Woods' test answers, or did you just rely
    on this report?
28

30

A. I did not review his test answers.

Acott Decl. Ex. 2 (Greene Dep.) at 41:14–42:19.  Dr. Greene does not know how to score the tests at issue.  *Id.* at 39:19–25.

Dr. Greene's report largely repeats Dr. Bramson's opinions, including drawing significant conclusions from scores as to certain personality scales that fell below the threshold for "clinically significant personality types," barely within the threshold for "personality style," and well below Woods's score for post-traumatic stress—a score Dr. Greene included in his factual summary but omitted from the opinion section of his report with an ellipsis, while reporting scores in other areas.  *See* Acott Decl. Ex. 1 (Greene Report) at 33, 40; Acott Decl. Ex. 3 (Bramson Report) at 2. Woods's report includes no explanation for why those scores are significant or why they suggest that other disorders or personality types explain his symptoms or behavior better than PTSD. When Woods's attorney questioned Dr. Greene about the basis for Dr. Bramson's conclusion, Dr. Greene responded: "unlike you I rely on Dr. Bramson to interpret the testing because I don't like to make claims based on numbers when I have no idea what they're talking about."  Acott Decl. Ex. 2 (Greene Dep.) at 130:4–7.

"A testifying expert may rely on the opinions of non-testifying experts as a foundation for the opinions within the testifying expert's field of expertise.  Rule 703,[15] however, is not a license for an expert witness to simply parrot the opinions of non-testifying experts." *Villagomes v. Lab'y Corp. of Am.*, No. 2:08-cv-00387-RLH, 2010 WL 4628085, at *4 (D. Nev. Nov. 8, 2010); *see also Aquino v. Cty. of Monterey Sheriff's Dep't*, No. 5:14-cv-03387-EJD, 2018 WL 3548867, at *4 (N.D. Cal. July 24, 2018) ("Accordingly, to the extent that Dr. Roberts' report contains opinions that require qualification as an expert, Defendants cannot introduce them by parroting them through Dr. Levy.").  In their opposition brief, Defendants do not grapple with this test in any

---

[15] Rule 703 of the Federal Rules of Evidence reads as follows: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."

United States District Court
Northern District of California

1   way, instead asserting overbroadly that "there is no legal authority that disallows Dr. Greene from

2   relying on the results of the psychological testing by Dr. Bramson," while citing no authority

3   themselves that would allow such opinions.  Defs.' Opp'n at 4.  The Court concludes that to the

4   extent Dr. Greene's opinions rest on Dr. Bramson's test analysis, he would impermissibly serve as

5   a mouthpiece for a non-testifying expert.  The motion to exclude opinions regarding Dr.

6   Bramson's analysis of Woods's test results is GRANTED.

### 5.   Opinions as to Treatment Utilization and Substantial Symptoms

8        After recounting Woods's treatment history, Dr. Greene offers the following opinion

9   regarding Woods's recommended and actual treatment for PTSD:

> Individuals who suffer from substantial symptoms of PTSD generally
> require individual therapy, consisting of hourly appointments on a
> weekly basis, group therapy, medication management, or
> hospitalization to address their symptoms. As Mr. Woods did not
> receive, and was not recommended, this higher level of treatment,
> then, his presentation supports my opinion that he did not suffer from
> severe emotional distress as a result of the 3/15/21 [sic] incident.

14  Acott Decl. Ex. 1 (Greene Report) at 40.

15       The parties dispute whether Dr. Greene has offered a sufficient basis to draw any

16  conclusions from Woods's decisions as to what treatment to accept.  There is no real question that

17  Dr. Greene, an experienced clinical and forensic psychiatrist, is qualified to testify as to treatment

18  typically *recommended* for PTSD.  But regardless, he offers these opinions only with respect to

19  patients suffering from "substantial symptoms of PTSD," and only to draw a conclusion as to

20  "severe emotional distress."  *See id.*  As discussed above, Dr. Greene's definition of "severe

21  emotional distress" is not useful to the jury's evaluation of this case.  His definition of "substantial

22  symptoms" is similarly irrelevant.  He acknowledges that "substantial symptoms" is not

23  "necessarily [a] clinical term[]," and defines it as referring to "a substantial number of symptoms

24  that are necessary to diagnose PTSD," or perhaps as addressing whether PTSD-related symptoms

25  "were themselves . . . severe enough to indicate [a need for] treatment."  *See* Acott Decl. Ex. 2

26  (Greene Dep.) at 59:10–60:15.

27       Defendants assert that although "[t]he deposition on this issue was a mess . . . [w]hat Dr.

28  Greene has explained, and what he will testify to at trial, is that because Plaintiff showed only a

few symptoms of PTSD in the DSM-V and did not receive therapy or any other medical or

psychological intervention, Plaintiff did not have 'substantial symptoms of PTSD.'"  Defs.' Opp'n

at 5.  That explanation does not address why the issue of "substantial symptoms" is relevant.

Given that there is no dispute Woods has had PTSD at all times relevant, *see* Acott Decl. Ex. 2

(Greene Dep.) at 55:3–5, it is not clear why the number of symptoms he experienced is relevant, or

why any expertise is necessary to tell the jury the factual matter of whether or not he received

treatment.  The motion to exclude these opinions is GRANTED.[16]

### 6.  Dr. Greene May Testify That PTSD Does Not Inhibit Reporting

Included within his broader opinions that the Court has excluded, Dr. Greene also states

that "[w]hen individuals experience substantial symptoms of PTSD, such as when they feel they

need medical intervention for their symptoms, they are able to report the presence of substantial

feelings of anxiety, panic symptoms, dissociation symptoms, a desire for self-destructive behavior,

problems with concentration, or memory impairment."  Acott Decl. Ex. 2 (Greene Report) at 36.

While the discussion of "substantial symptoms" is excluded as discussed above, the underlying

opinion that PTSD does not prevent an individual from reporting the symptoms they are

experiencing falls within Dr. Greene's expertise, and could perhaps be relevant to the case.  Dr.

Greene may present that narrow opinion at trial if Defendants believe it would be useful to the

jury.

The Court has identified no other expert opinions in Dr. Greene's report that are

permissible under the *Daubert* standard.

## V.   ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

Woods moves to file portions of his briefing and certain documents submitted therewith

under seal.  A party seeking to overcome the presumption of public access to documents filed in

judicial proceedings generally must establish "compelling reasons" to file documents under seal.

---

[16] At his deposition, Dr. Greene testified that certain symptoms Woods reported are not "criteria for PTSD."  Acott Decl. Ex. 2 (Greene Dep.) at 69:15–25.  To the extent this testimony might have been intended as saying that those symptoms would not be caused by PTSD, that question likely falls within Dr. Greene's expertise, but since no such opinion appears in his report, he may not testify to that issue.

United States District Court
Northern District of California

1   *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).

2   To the extent Woods's proposed redactions are based on his own or others' medical

3   privacy, privacy interests related to juvenile correctional records, or the privacy protections of

4   Rule 5.2, Woods has shown compelling reasons to maintain that material under seal and his

5   requests are narrowly tailored, and his motions to seal are GRANTED.

6   As for material that Woods seeks to seal based solely on Defendants' designations of

7   confidentiality, however, Defendants have not provided a responsive declaration setting forth

8   compelling reasons to seal as required by Civil Local Rule 79-5(e)(1).  Woods's motions to seal

9   are therefore DENIED as to the following material:

10   • Exhibit 1 (Dr. Greene's report) to the declaration of Francis Acott in support of

11   Woods's motion to exclude at page 10, lines 28–40; page 11, lines 1–4; and page

12   36, lines 23–40.

13   • All proposed redactions in Woods's brief in opposition to Defendants' motion for

14   summary judgment.

15   Woods is ORDERED to provide new public versions of those documents omitting those

16   redactions (except that Woods must redact any information governed by Rule 5.2 that might be

17   contained in those passages) no earlier than September 13, 2021 and no later than September 17,

18   2021.  *See* Civ. L.R. 79-5(e)(2).

19   While Defendants also have not responded to Woods's request to seal Defendants' audio

20   and video recordings (Acott Opp'n Decl. Exs. 19–27) based on their confidentiality designations,

21   most if not all of those recordings contain information protected by Rule 5.2 or otherwise

22   implicate the privacy interests of minors who are not parties to this case, and redaction would be

23   impractical.  Woods's motion to file the recordings under seal is GRANTED.

24   **VI.    CONCLUSION**

25   For the reasons discussed above, Defendants' motion for summary judgment is

26   GRANTED as to all claims against Defendants Tong and Pola.  That motion is DENIED as to

27   Woods's ADA and negligence claims against the City of Hayward and the Hayward Police

28   Department.

United States District Court
Northern District of California

Woods's motion to exclude Dr. Greene's expert testimony and report is GRANTED, except as to the narrow opinion that PTSD does not prevent an individual from reporting their symptoms.

Woods's administrative motions to file under seal are GRANTED in part and DENIED in part as discussed above.  Woods shall file new public versions of his opposition brief and Dr. Greene's report no earlier than September 13, 2021 and no later than September 17, 2021.

**IT IS SO ORDERED.**

Dated: September 7, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California